Fox *v.* Republic National Life Insurance Company.

4-6640                                          159 S. W. 2d 67

Opinion delivered February 23, 1942.

*Holland & Taylor,* for appellant.

*Walter L. Pope,* and *Shane & Fendler,* for appellee.

Griffin Smith, C. J.   Dr. Vernon R. Fox and others have appealed from a decree foreclosing three mortgages. The causes were consolidated for trial as Case No. 7244.[1]

Appellants seek to avoid the mortgages on the ground they were given to secure notes for stock issued by the insurance company, in violation of Act 493, approved March 25, 1921.   Pope's Digest, § 7683.   It is also urged

---

[1] The debt secured by the first mortgage was found to be $7,047.74 as of Sept. 17, 1941.  Balance on the second mortgage was $5,544.16, and as to the third, it was $1,758.75.

that the transactions complained of contravene the constitution. Art. 12, § 8.[2]

Public National Insurance Company, hereinafter called Public, had been domiciled in Missouri. In 1935 it moved to Little Rock and incorporated in this state. It first began selling stock under a tentative permit issued by the bank commissioner November 27, 1935. In January following, the commissioner superseded the conditional permit with its conventional certificate. Application filed with the bank commissioner showed that incorporators of the company had paid for $80,006.50 of the authorized stock issue of $200,000. The Arkansas certificate permitted the company to sell 20,000 shares of common stock at $5 per share.

December 2, 1935, Fox contracted for 2,400 shares. He borrowed $12,000 from the company with which to make payment, and mortgaged lands to secure the debt. An appraisement disclosed that the property was worth more than twice the amount borrowed. The mortgage was subject to an existing lien of $1,460. Because of delay in clearing title to the land, the company's check to Fox was not delivered until May 15, 1936. It was indorsed and redelivered to the company in payment of stock.[3]

In August, 1936, Fox contracted for 2,000 additional shares, the consideration being $10,000. This transaction was handled like the first, except that $1,300 was paid in cash. A note for $8,700, secured by mortgage on real estate, was given. Payments aggregating $3,200 were made.[4]

---

[2] "No private corporation shall issue stocks or bonds, except for money or property actually received or labor done, and all fictitious increase of stock or indebtedness shall be void; nor shall the stock or bonded indebtedness of any private corporation be increased, except in pursuance of general laws, nor until the consent of the persons holding the larger amount in value of stock shall be obtained. . . ."

[3] Payments reducing the principal of this loan to $6,131.42 were made. Taxes of $586.62, insurance amounting to $110.30, and abstract fees of $80.50 were paid by the company.

[4] Accrued interest was $864.08; taxes and abstract fees, $46.18. As of April 8, 1941, the amount due was $5,410.26.

October 28, 1941, the third mortgage was given to secure a loan of $1,500. Proceeds were used to pay taxes, insurance, and interest, other than the items mentioned in footnotes 3 and 4.

Prior to December 31, 1936, Fox, who is a physician, became the owner of 5,000 shares of Public stock at a cost of $25,000. He was made a member of the board of directors, and was then selected as chief medical director.

By agreement in July, 1936, between Public and the bank commissioner, the company's right to sell stock in Arkansas was suspended ". . . pending compliance with certain requirements made by the department."[5]

Business of Public was absorbed by the Republic National Life Insurance Company, of Dallas, Texas. Fox followed fortunes of the company when "Republic" superseded "Public." He was elected to the directorate of the Dallas company, and (presumably because of his financial interest and the experience received as an officer and executive[6] of the old company) served until January, 1938.

---

[5] April 17, 1936, Miss Aline Murray, assistant bank commissioner, wrote the company that "Permits for the sale of your stock were issued January 25, 1936, and you were requested to make monthly reports showing amounts of sales and names and addresses of purchasers of your stock, none of which has been received to date. Please let us have this information promptly."

July 16, 1936, the deputy commissioner wrote an interested party, setting out the following requirements in respect of Public National's activities: (1) That stock issued in connection with loans made by the company and secured by mortgages be recalled and canceled and the mortgages removed from the assets of the company. (2) That all contracts for the sale of stock upon misrepresentation by agents as to the financial status or present earning power of the company, or upon promises of directorship or officership in the company be canceled, and any stock issued under such contracts be recalled and canceled. (3) That agents who have misrepresented the financial status or present earning power of the company, who have failed to state par and selling price of the stock, or who have promised positions with the company to prospective purchasers in selling or offering for sale the stock of the company be dismissed as agents of the company.

[6] The term "executive" has reference to his position as chief medical director.

After Fox retired from Republic he entered a plea of guilty to a federal indictment and was sentenced to serve two years in prison.[7]

October 28, 1938, Fox and Republic had a settlement. Fox was paid more than three thousand dollars. Two lots in the town of Manila were released from mortgage. An extension of time was given within which Fox might pay the remaining indebtedness of over $11,000.

The agreement evidencing settlement recites that the mortgages were given to secure sums of money borrowed from Public, and ". . . said mortgages were valid when executed and are now valid, subsisting liens upon the lands."

When Republic acquired assets of the old company, all Public stock was transferred to a voting trust. Pope's Digest, § 2175. Fox received 20,000 trust units. He sold 13,809.[8]

Appellants urge error in the decree (a) because, as they say, Public was without authority to accept real estate mortgages; (b) the notes and mortgages are void because consideration was stock in a corporation; (c) the stock was issued to Fox in violation of the statute regulating issuance and sale of investments.

Appellee insists that it is protected by the statutes embraced within § 7679 of Pope's Digest. Section 4 of Act 493 of 1921 authorizes a domestic company to invest its funds in notes or bonds secured by first mortgages or deeds of trust on real estate in Arkansas ". . . for not more than half of the value thereof." The section was amended by Act 47, approved February 18, 1935, and by Act 159, approved March 1, 1937; but the right to take mortgages was not impaired.

We do not agree with appellee that § 4 of Act 493 was intended to authorize acceptance of mortgages or deeds of trust securing notes given in payment of stock in an insurance company being created. The statute refers to "the funds of any domestic insurance company," and

---

[7] The offense was committed through illegal sale of narcotics.

[8] Purchasers were: Lee Wilson, 264 units; C. C. Hudgens, 1,600; R. L. Ferguson, 9,600; Ethel Wilson, 145; Jewell Stallings Fox, 2,200.

provides how such funds may be invested. Subdivisions 3 and 5 of the Act refer to "loans previously made," and to "debts previously contracted." It appears, however, that Public had been organized. It was incorporated under the laws of Arkansas July 30, 1935, and its application for authority to sell stock was filed with the state bank department August 22 of the same year. Section 11 of the application, and succeeding sections, set out the general plan ". . . upon which the company is doing business and intends to do business, and the purpose for which said securities are to be sold." [9] As far as this record discloses, funds of the company then in the treasury were loaned to Fox on the mortgages.

The constitutional provision relied upon by appellants prohibits a private corporation from issuing its stock or bonds except for money paid, property received, or labor done.

In *Bank of Commerce* v. *Goolsby,* 129 Ark. 416, 196 S. W. 803, it was held that a note taken in exchange for stock in a corporation constitutes a violation of the constitution, ". . . because notes are merely evidences of indebtedness, and such a transaction shows upon its face that the stock has not been paid for." It was then said that design of those who framed the constitution was to prevent issuance and sale of stock ". . . except for its value in money or property actually received, or labor done." Where a note is worthless, the opinion says, the stock has been exchanged for nothing.

In *Bank of Manila* v. *Wallace,* 177 Ark. 190, 5 S. W. 2d 937, it was said: "If the corporation could not take the note of a subscriber in payment of its own capital stock, it is plain that it could not lend money to a subscriber to its own capital stock in payment of it."

A note given for stock in a corporation was held void in *Lepanto Gin Company* v. *Barnes,* 182 Ark. 422, 31 S. W.

---

[9] It is said: "The company was just organized and consolidated with Public National Life Insurance Company of Joplin, Mo. This company does a general life insurance business on stipulated premium plan. It is supervised by Arkansas insurance department and insurance department in the states in which it does business. Securities are sold for the purpose of increasing capital to all old line requirements, development of new business, and paying of commission."

2d 746. The note reads: ''This note is given in considera-
tion of three shares of the capital stock of the Lepanto
Gin Company, and is given with the understanding and
agreement that [the maker is] to gin cotton, such as [he
owns or controls] with the . . . company. In case
of my failure to do so, then this stock shall be forfeited
and returned to the Lepanto Gin Company.''[10]   The cases
shown in the footnote relate to unsecured notes. *Bank of
Manila* v. *Wallace,* and *Park* v. *Bank of Lockesburg,* up-
held liability on unsecured notes in the hands of innocent
purchasers on the theory that the notes were only void-
able, and not void.[11]

A headnote to *Pollard* v. *Reisinger,* 161 Ark. 427, 256
S. W. 382, is: ''Where personal property had a cash value
equal to the amount of capital stock of a corporation
issued therefor, and was accepted in payment therefor
by the stockholders and directors of the corporation, it
was full payment therefor.''

*Foreman* v. *G. D. Holloway & Son,* 122 Ark. 341, 183
S. W. 763, and *Whittington* v. *Flint,* 43 Ark. 504, 51 Am.
Rep. 572, hold that title to real property included in a
mortgage passes to the mortgagee in order that the
security may be available for payment of or application
on the debt.[12]

*Lester* v. *Bemis Lumber Company,* 71 Ark. 379, 74
S. W. 518, was a suit by Lester and Hamilton, creditors
of the lumber company, an insolvent Texas corporation,
to compel two resident stockholders of the corporation to
pay sums alleged to be due by them on stock subscrip-

[10] See *Wait* v. *McKee,* 95 Ark. 124, 128 S. W. 1028; *Ozark Dia-
mond Mine Corporation* v. *Townes & Garanflo,* 117 Ark. 552, 174 S. W.
151; *Bank of Dermott* v. *Measel,* 172 Ark. 193, 287 S. W. 1017; *Park*
v. *Bank of Lockesburg,* 178 Ark. 669, 11 S. W. 2d 483; *Ellis* v. *Jones-
boro Bank & Trust Co.,* 179 Ark. 615, 17 S. W. 2d 324; *Taylor* v. *Gor-
don,* 180 Ark. 753, 22 S. W. 2d 561.

[11] Section 10 of Act 255, approved April 1, 1931, is: "Shares of
stock other than shares without nominal or par value may be issued
only for a consideration having a value in the judgment of the board
of directors of the corporation at least equivalent to the full par value
of the stock so to be issued; and in the absence of fraud, or wilful
over or under valuation in the transaction, the judgment of the direc-
tors as to the value of any such consideration shall be conclusive."

[12] See Pope's Digest, §§ 13 262-63.

tions. The Texas constitution contains a provision similar to ours, being: "No corporation shall issue stock or bonds except for money paid, labor done, or property actually received, and all fictitious increases of stock shall be void." Art. 12, § 6. In construing this language, Mr. Justice RIDDICK, who wrote the court's opinion, said the intention was to forbid corporations from issuing stock or bonds without a valuable consideration therefor. "In other words, it is a prohibition against issuing what is termed 'watered' stock; that is, stock which purports to be paid in full, but which in fact has not been fully paid for." It was then said that the property a corporation may lawfully exchange for its stock or bonds ". . . is property of the kind which the corporation may lawfully acquire and hold in carrying out the purposes of its incorporation."

The Supreme Court of Texas, in *General Bonding & C. Company* v. *Mosley,* 110 Tex. 529, 222 S. W. 961, overruled two of its former cases, saying:

"A subscriber's note secured by a valid first mortgage upon real estate accepted by the corporation in payment for stock cannot be held as other than property in the full sense of the constitution. The corporation thereby obtains something more than the mere promise of a subscriber to pay. It obtains the right in which the land may be appropriated to the payment of the note. This is a valuable right or property right, as fully as any contract right. The right acquired under such mortgages is clearly property."

Section 39, Art. 9, constitution of Oklahoma, is: "No corporation shall issue stock except for money, labor done, or property actually received, to the amount of the par value thereof." In *Harn* v. *Smith,* 85 Okla. 137, 204 Pac. 642, the court held the intention was to require that the actual value of the property received equal the par value of the stock. A corporation, it was said, may receive real or personal property in payment of its capital stock, provided the property is of a kind the corporation may lawfully acquire and hold for carrying out the objects and purposes for which it was organized, or in which it is required by statute to invest its funds.

Section 193 of Kentucky's constitution provides: "No corporation shall issue stock or bonds except for an equivalent in money paid or labor done." In *Clarke* v. *Lexington Stone Works*, (Ky.) 72 S. W. 286, it was held that acceptance of a note secured by an insurance policy was appropriate payment for corporation stock.[13]

We do not think the Fox obligations were void because of alleged violations of the Arkansas Securities Act. Section 7821 of Pope's Digest requires the capital stock of an insurance corporation to be not less than $50,000. In respect of Public, $80,000 had been paid.

While one may not estop himself to repudiate a void transaction, a voidable commitment is subject to ratification.

By becoming a member of the board of directors when Public entered Arkansas, and by pursuing the same course when the business was taken over by Republic, Fox estopped himself to complain of transactions he now seeks to avoid. Not only did he join the directorate and accept appointment as chief medical advisor, but he sold nearly fourteen thousand units of his voting trust certificates. He must now abide the consequences of his acts.

Affirmed.

---

[13] See *Sohland* v. *Baker*, 15 Del. App. 431, 141 Atl. 277, 58 A. L. R. 693.