Willie L. McNatt and Helen C. McNatt v. Commissioner. Sam Frank, Jr., and Esther Frank v. Commissioner.
McNatt v. Commissioner
Docket Nos. 88376, 88552.
United States Tax Court
T.C. Memo 1962-99; 1962 Tax Ct. Memo LEXIS 210; 21 T.C.M. (CCH) 542; T.C.M. (RIA) 62099; April 26, 1962
Ronald M. Mankoff, Esq., for the petitioners. Harold D. Rogers, Esq., for the respondent. SCOTT
Memorandum Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the years 1956 and 1957 in the following amounts: Docket No. 88376 - Willie L. McNatt and
Helen C. McNatt
Year
Deficiency
1956
$17,140.97
1957
69,355.06
Docket No. 88552 - Sam Frank, Jr., and
Esther Frank
1956
$15,474.25
1957
71,335.70
*211 The issues for decision are: (1) Whether petitioners Willie L. McNatt and Sam Frank, Jr., received income as compensation for services upon receipts of stock of Bankers Insurance Company and Peoples Indemnity Insurance Company which they were permitted to purchase at a fixed price pursuant to agreements between them and the two companies with respect to the promotion and sale of stock of the companies. (2) Whether the stock of Bankers Insurance Company and Peoples Indemnity Insurance Company sold by petitioners Willie L. McNatt and Sam Frank, Jr., and their joint venture in 1956 and 1957 had been held for less than 6 months so that the gain upon the sale of the stock constituted a short-term capital gain. (3) In the alternative, whether the stock of Bankers Insurance Company and Peoples Indemnity Insurance Company sold by petitioners Willie L. McNatt and Sam Frank, Jr., and their joint venture in 1956 and 1957 was property held primarily for sale to customers in the ordinary course of their trade or business. All of the facts have been stipulated and are found accordingly. Petitioners Willie L. McNatt (hereinafter referred to as McNatt) and Helen C. McNatt are husband and *212 wife residing at Dallas, Texas. They filed joint income tax returns for the calendar years 1956 and 1957 with the district director of internal revenue at Little Rock, Arkansas. Petitioners Sam Frank, Jr. (hereinafter referred to as Frank) and Esther Frank are husband and wife, residing in Los Angeles, California. They filed joint income tax returns for the calendar years 1956 and 1957 with the district director of internal revenue at Little Rock, Arkansas. Frank and McNatt each were on the cash basis of reporting income and expenses during the calendar years 1956 and 1957. McNatt was registered with the State Securities Board, State of Texas, as an individual general securities dealer from October 11, 1954 until April 26, 1956. Frank was registered with the State Securities Board, State of Texas, as an individual general securities dealer from February 4, 1954, until December 31, 1955. Republic Trust Securities Company of Dallas, Texas, was until terminated on November 30, 1955, a partnership, the principal partners of which were McNatt and Frank. On November 17, 1955, this partnership became registered as a general securities dealer in the State of Texas. On November 30, 1955, National *213 Republic Trust, Inc., Dallas, Texas, a corporation of which Frank was president and McNatt was vice president, became registered as a corporate securities dealer in the State of Texas. On February 28, 1956, Frank and McNatt organized a joint venture in which each had a 50 percent interest. This joint venture (hereinafter referred to as the joint venture) filed Federal partnership returns of income for the years 1956 and 1957 showing its address as Little Rock, Arkansas. The joint venture was terminated as of January 1958. Prior to February 28, 1956, Frank, representing himself and McNatt, met with the officers and directors of Bankers Insurance Company (hereinafter referred to as Bankers) of Conway, Arkansas, and consulted with and advised them on methods for raising additional capital. Bankers had been founded by its president, E. R. Keller, with an initial authorized capital of 100,000 shares at 50 cents par value per share. The plan developed by Frank and Bankers called for the application by Bankers to the Arkansas Banking Commission for authority to change to no-par stock, to issue and offer 100,000 additional shares of its stock at $1.50 per share, and thereafter to apply *214 for authority to issue and offer 200,000 additional shares of its stock at $5 per share. The additional issue of 100,000 shares was to be offered to McNatt, Frank, and Bankers' insurance agents. Of this additional issue, the insurance agents of Bankers purchased 40,000 shares at $1.50 per share, and 60,000 shares were offered to Frank and McNatt. Also, an additional 40,000 shares were sold to Bankers' president, E. R. Keller, and its secretary, H. C. Berryman, at $1.25 per share. On February 28, 1956, Bankers as first party and Frank and McNatt as second party entered into a contract whereby Bankers agreed to make available to Frank and McNatt 100,000 shares of Bankers' stock to be sold exclusively within the State of Arkansas for $1.50 per share and as compensation for the services of Frank and McNatt to pay them 10 cents per share on each share of stock sold. This contract further provided: THIRD: In further consideration for the services of the Second Party, the First Party agrees to permit the Second Party to purchase fifty thousand (50,000) shares of the said one hundred thousand (100,000) shares of stock offered by the First Party, and further, to permit the Second Party *215 to pay for the shares on an installment payment plan, to-wit: The Second Party agrees to pay Seven Hundred and Fifty Dollars ($750.00) herewith, being the initial payment on the said stock, and agrees to pay Seven Hundred and Fifty Dollars ($750.00) on the 5th day of each month hereafter, beginning on the 5th day of April, 1956, until one year from the execution date of this Agreement, at which time the balance of the monies owed by the Second Party for the stock purchased will become due and payable. It is specifically understood by both parties hereto that the Second Party may make payments under this Agreement at a greater rate than set forth in the Contract and that the First Party will issue to the Second Party that amount of stock completely paid for, as paid for. If the Second Party shall fail to pay any of the said installments when due and the default shall continue for at least thirty (30) days, then, and in such case, the First Party may terminate this Agreement and all of the rights of the Second Party thereunder, it being understood that the Second Party will be issued all stock which he has paid for at the rate of $1.50 per share, and will be paid the commission for *216 all stock then sold as set out in the SECOND paragraph. FOURTH: It is agreed by the Second Party that as a stockholder of the First Party, he will agree to any subordination agreement which is required by the State Banking Commission to permit the issue of an additional two hundred thousand (200,000) shares of stock for public offering, whereby the stockholders of the first party shall not offer or sell any of the stock of the First Party until the new two hundred thousand (200,000) share issue has been completely sold or until the balance unsold is removed from the open market. On March 7, 1956, Bankers was authorized by the State of Arkansas to issue 100,000 additional shares of stock and to offer these shares at $1.50 per share. On February 28, 1956, National Securities Corporation (hereinafter referred to as National) was incorporated under the laws of the State of Arkansas. Frank was president, and McNatt, Vice President of this corporation, and each owned 49 percent of its stock. By contract entered into on February 28, 1956, between Bankers andNational, Bankers retained National as its exclusive agent to sell for it by public offer 200,000 shares of its capital stock, *217 the public offering price to be yet determined and the sale to be subject to the approval and regulation of the State Insurance Commission and the State Bank Department of the State of Arkansas. National agreed to become qualified under the laws of the State of Arkansas to act as a dealer in stocks and when so qualified to promote and sell the contemplated issue of the capital stock of Bankers. Bankers agreed to pay National a commission of 20 percent on each share of stock sold. On March 29, 1956, Bankers was given authority to issue an additional 200,000 shares of stock and to offer it to the public at $5 per share. This permit was amended as of September 14, 1956, to permit the sale of a certain number of shares at $6.25 and was further amended on December 4, 1956, to permit the sale of a certain number of shares at $7.25 per share. On April 2, 1956, National was licensed under the laws of the State of Arkansas to deal in and sell insurance company securities. On March 10, 1956, Frank and McNatt executed and delivered their joint promissory note in the amount of $70,000 to Bankers providing for payment of the sum one year after date for value received with interest upon maturity *218 at the rate of 6 percent per annum. On March 22, 1956, Frank delivered $350 in cash to Bankers and executed and delivered an installment stock subscription note dated March 10, 1956, which provided as follows: I, the undersigned hereby subscribe to 25,000 shares of no par value common stock of Bankers Insurance Company at $1.50 per share (less 10" per share as company's agent) and for value received promise to pay to the order of Bankers Insurance Company, the sum of $35,000.00 as follows: $350.00 paid herewith, and $350.00 on or before the 1st day of each and every succeeding month for ELEVEN (11) consecutive months, the balance due and payable twelve (12) months from date hereof, said sum to bear interest at the rate of six per cent (6%) per annum from maturity until paid. I further agree: 1. That the certificate for such shares of stock shall be delivered to me only when the full purchase price shall have been paid for as herein provided. 2. That I shall not be entitled to receive any dividend until the purchase price shall have been paid in full. On March 22, 1956, Certificate No. 172 representing 25,000 shares of Bankers' stock was made out in the name of Frank and United *219 States documentary stamps of $56.25 were affixed and cancelled. The certificate was attached to Frank's note and held by Bankers. There was typed across the top of this certificate the following statement: This certificate held by Bankers Insurance Company in accordance with terms of a certain Stock Subscription Note dated March 10, 1956. Note: This certificate should be reissued to clear lien when note is paid in full. The note receivable ledger of Bankers shows the following payments made by Frank pursuant to the contract with Bankers of February 28, 1956 and his note dated March 10, 1956: 1956
Debit
Credit
Balance
3-10
Certificate No. 172 - 25,000 shares at $1.40
$35,000
$35,000
3-23
By check
$ 350
34,650
4- 9
By check
140
34,160
9-14
By check through Sept.
1,610
32,550
9-14
By check Oct. & Nov.
700
31,850
12-10
By check Dec.
350
31,500
12-17
By check
7,000
24,500
12-17
Retirement of Note
24,500
0
12-17
Certificate No. 1045 - 15,000 shares at $1.40
24,500
24,500
12-17
By check
7,000
17,500
1957
2-14
By check
17,500
0 On December 17, 1956, Bankers turned over 10,000 shares of its *220 stock to Frank. On January 14, 1957, Certificate No. 1045 representing 15,000 shares of Bankers' stock was made out in the name of Frank. There was typed across the top of this certificate the following statement: This certificate held by Bankers Insurance Company in accordance with the terms of a certain stock subscription note dated December 17, 1956. NOTE: This certificate should be reissued to clear lien when note is paid in full. On December 17, 1956, Frank executed and delivered a stock subscription note to Bankers in the amount of $24,500 whereby he subscribed to 15,000 shares of no par value common stock of Bankers. This note contained the same provisions except for amounts and dates as stated in the stock subscription note dated March 10, 1956, given by Frank to Bankers. On February 14, 1957, Bankers turned over 15,000 shares of its stock to Frank. On March 22, 1956, McNatt delivered $350 in cash to Bankers and executed and delivered his installment stock subscription note dated March 10, 1956, in the amount of $35,000 to Bankers. The note executed by McNatt was identical to that executed by Frank. On March 23, 1956, Certificate No. 175 representing 25,000 shares of *221 Bankers' stock was made out in the name of McNatt and United States documentary stamps in the amount of $56.25 were affixed and cancelled. This certificate had the same statement typed across its top as did Certificate No. 172 made out in the name of Frank. Certificate No. 175 was attached to McNatt's note and held by Bankers. The note receivable ledger of Bankers shows the following payments made by McNatt pursuant to the contract between Bankers andFrank and McNatt dated February 28, 1956, and his installment stock subscription note: 1956
Debit
Credit
Balance
3-10
Certificate No. 175 - 25,000 shares at $1.40
$35,000
$35,000
3-23
By check
$ 350
34,650
4- 9
By check
350
34,300
7-26
By check
140
34,160
9-14
By check through Sept.
1,610
32,550
9-14
By check Oct & Nov.
700
31,850
12-10
By check Dec.
350
31,500
12-17
By check
7,000
24,500
12-17
Retirement of Note
24,500
0
12-17
Certificate No. 1047 - 15,000 shares at $1.40
24,500
24,500
12-17
By check
7,000
17,500
1957
2-14
By check
17,500
0 On December 17, 1956, Bankers turned over to McNatt 10,000 shares of its stock. On that same *222 day Bankers retired the balance of McNatt's original note in the amount of $24,500 and McNatt executed an installment stock subscription note to Bankers in the amount of $24,500 for which he subscribed to 15,000 shares of no par value common stock of Bankers. [1] This note was identical to the note dated March 10, 1956, executed and delivered to Bankers on March 22, 1956, except as to amounts and dates. On January 14, 1957, Certificate No. 1047 representing 15,000 shares of Bankers' stock was made out in the name of McNatt. Typed across the top of this certificate was the same statement as that typed across the top of Certificate No. 175 made out in the name of McNatt. On February 14, 1957, Bankers turned over 15,000 shares of its stock to McNatt. On March 22, 1956, Frank and McNatt jointly executed and delivered their promissory note in the amount of $14,000 to Bankers. This note provided for payment for value received one year after date *223 with interest from maturity at the rate of 6 percent per annum. On March 22, 1956, Certificate No. 173 representing 10,000 shares of Bankers' stock was made out in the name of Frank and McNatt jointly and United States documentary stamps of $22.50 were affixed and cancelled. The certificate was attached to their note and held by Bankers as collateral and security for the payment of their obligation to Bankers. The following statement was typed across the top of Certificate No. 173: This Certificate to be held by Bankers Insurance Co. in accordance with the terms of a certain Stock Subscription Note dated March 22, 1956. Note: This Certificate should be reissued to clear lien when note is paid in full. The note receivable ledger of Bankers discloses the following payments made by Frank and McNatt: 1956
Debit
Credit
Balance
3-22
Certificate No. 173 - 10,000 shares at $1.40
$14,000
$14,000
3-23
By check
$ 140
13,860
4- 9
By check
140
13,720
6-13
By check
140
13,580
7-26
By check
13,580
0 On July 26, 1956, Bankers turned over 10,000 shares of its stock to Frank and McNatt by turning over 5,000 shares to Frank and 5,000 *224 shares to McNatt. Frank and McNatt voted 60,000 shares of stock at a special meeting of the stockholders on July 2, 1956, by giving their proxies to E. R. Keller, president of Bankers. Frank and McNatt voted at the next stockholders' meeting held on May 7, 1957. Peoples Indemnity Insurance Company of Conway, Arkansas, hereinafter referred to as Peoples, was organized by H. R. Keller, the son of E. R. Keller, the president of Bankers, as an Arkansas Corporation on October 25, 1956, with authorized capital stock of $50,000 consisting of 250,000 shares of no par stock. Prior to November 2, 1956, Frank and McNatt met with the officers and directors of Peoples and consulted with and advised them on methods of raising additional capital. By contract dated November 2, 1956, between Peoples as first party and Frank and McNatt as second party, Peoples agreed to make available to Frank and McNatt 250,000 shares of the stock of Peoples to be sold for 50 cents per share exclusively within the borders of the State of Arkansas to residents of Arkansas only. As compensation and reimbursement of expenses to be incurred by Frank and McNatt Peoples agreed to pay them 10 cents per share on each share *225 of stock sold. This agreement further provided: THIRD: In further consideration for the services of the Second Party, the First Party agrees to permit the Second Party to purchase One Hundred Thousand (100,000) shares of the said Two Hundred Fifty Thousand (250,000) shares of stock offered by the First Party and further, to permit the Second Party to pay for the shares, to-wit: The purchase price to be satisfied by the payment by the Second Party of Five Hundred Dollars ($500.00) in cash and one non-interest bearing promissory note of Forty-Nine Thousand Five Hundred Dollars ($49,500), payable one year from date, all of which consideration the receipt of which is hereby acknowledged by the First Party, the note to be collaterally secured by the shares of stock for which they were respectively given. The First Party in turn will cause to be issued in the name of the Second Party one certificate for One Hundred Thousand (100,000) shares of stock, which stock, together with the note, shall be deposited with the First Party, as escrow agents subject to the terms and conditions set forth hereinafter; The escrow agreement may be altered, modified, or terminated by mutual agreement *226 of both parties. All payments on the note are to be construed as in full payment of shares of stock on the basis of Fifty Cents ($.50) per share, less Ten Cents ($.10) commission credited per share to Second Party. It is specifically understood by both parties that Second Party may make payments on note at a greater rate than set forth in this contract and that the First Party will issue to the Second Party that amount of stock completely paid for as paid for. In the event that this agreement is terminated by default or otherwise by either party, then all payment made shall be deemed to have been made for shares at Fifty Cents ($.50) per share less Ten Cents ($.10) per share commission credited to Second Party and such stock shall be at that time delivered to Second Party. FOURTH: It is agreed by the Second Party that as a stockholder, of the First Party, they will agree to any subordination agreement which is required by the State Bank Commission to permit the issuance of an additional One Hundred Thousand (100,000) shares of stock for public offering at a price greather [Greater] than One Dollar ($1.00) per share, whereby, the stockholder of the First Party will not offer *227 or sell any of the stock owned by them of the First Party until the public offering, at a price greater than One Dollar ($1.00) per share, has been completely sold or until the balance unsold is removed from the open market. On November 2, 1956, Frank and McNatt executed and delivered their promissory note in the amount of $49,500 to Peoples whereby they promised to pay that amount one year after date for value received with interest from maturity at the rate of 6 percent per annum. On November 27, 1956, Frank and McNatt each executed a stock subscription note to Peoples, subscribing for 50,000 shares of Peoples' no par value common stock, in the amount of $24,750 to be paid on or before one year from the date thereof and to bear interest at the rate of 6 percent per annum from maturity until paid. On this same day Frank and McNatt each paid $250 to Peoples. Each of the notes provided in part as follows: I FURTHER AGREE: That the certificate for such shares of stock shall be delivered to me, only when the full purchase price shall have been paid for, as herein provided. NOW, in the event of the nonpayment of this note at maturity or any installment of interest thereon, the *228 holder hereof is hereby invested with full authority to use, transfer, hypothecate, sell or convey said property, or any part thereof, or any substitute therefor, or cause the same to be done at public or private sale, with or without notice or demand of any sort, at such place and on such terms as the said holder hereof may deem best, and the holder of this note is authorized to purchase collaterals when sold for his own protection; and the proceeds of such sale, transfer or hypothecation shall be applied to the payment of this note, and/or other indebtedness together with all protests, damages, interests, cost and charges due upon the note and/or other indebtedness, or incurred by reason of its nonpayment when due, or in the execution of this power. The surplus, if any, after payment of this note and/or other indebtedness, together with all charges above stated, shall be paid to the maker of this note (or at the election of the holder hereof, be paid on any other obligation of the maker hereof, whether as principal debtor or otherwise, held by the holder hereof) and if the proceeds of the sale shall not be sufficient to pay this note, the maker hereof shall agree to make good any *229 deficit. On July 18, 1957, an addendum was added to each of the stock subscription notes of Frank and McNatt wherein Peoples agreed as follows: We do hereby agree to waive the interest which will be due on this Subscription Note from maturity date. We do hereby agree to issue shares of stock from time to time as they are fully paid. On December 10, 1956, certificate No. 122 was made out in the name of Frank, and certificate No. 123 was made out in the name of McNatt, each representing 50,000 shares of Peoples' stock and United States documentary stamps of $37.50 were affixed to each of these certificates and cancelled. Certificate No. 122 was attached to Frank's note and certificate No. 123 to McNatt's note and held by Peoples. Each of these certificates bore at the top thereof the following typewritten statement: NOTE: This certificate is held by Peoples Indemnity Insurance Company in accordance with the terms of a certain Stock Subscription Note Dated November 2, 1956. NOTE: This Certificate should be reissued to clear lein when note is paid in full. The note receivable ledger of Peoples shows the following payments made by Frank and McNatt in accordance with the provisions *230 of their contract with Peoples dated November 2, 1956, and their stock subscription notes dated November 27, 1956: Date
Frank
McNatt
11-27-56
Certificate Nos.
122 and 123
100,000 shares
at 50 cents
$ 250.00
$ 250.00
7-19-57
5,000.00
5,000.00
9- 6-57
5,000.00
5,000.00
10-22-57
5,000.00
5,000.00
11-18-57
5,000.00
5,000.00
11-30-57
4,950.00
4,950.00
Total
$25,200.00
$25,200.00
Overpayment refunded
200.00
200.00
$25,000.00
$25,000.00
The Arkansas State Bank Department on November 27, 1956, issued its certificate of authority to Peoples to offer 250,000 shares of its stock at 50 cents per share. In addition to the 100,000 shares of stock which Peoples agreed to permit Frank and McNatt to purchase, 50,000 shares of Peoples' stock was issued and sold to Peoples' insurance agents between November 2, 1956, and December 31, 1956. On March 6, 1957, Peoples entered into a contract with National whereby it retained National for a period of 5 years as its exclusive agent to sell for it by public offering 100,000 shares of capital stock, the public offering price to be yet determined and the sale to be subject to *231 the approval and regulations of the State Insurance Commission and the State Bank Department of the State of Arkansas. Peoples agreed to pay National for its services a commission of 15 percent per share sold and in addition to the commission an amount not to exceed 5 percent for each share sold to apply to National's general expenses. On April 4, 1957, the Arkansas State Bank Department issued a certificate of authority authorizing Peoples to offer 100,000 shares of its stock at $3 per share and on April 4, 1958, authorized it to sell the unsold portion of the 100,000 shares at $3 per share. Between July 29 and November 30, 1957 Peoples turned over 50,000 shares of its stock to McNatt and 50,000 shares to Frank. Frank and McNatt voted 100,000 shares of Peoples' stock at the regular corporate meeting of March 5, 1957. During the period from April 7, 1956 through December 31, 1957 Frank and McNatt devoted substantially all of their time to the management of National. The balance of their time was devoted to the management of their private investments. National maintained regular offices, employed over 20 salesmen, and represented itself to the public as a security dealer. McNatt was *232 not issued a license to sell securities in Arkansas. A certificate of authority was issued by the Arkansas State Bank Department designating Frank as an agent of Bankers for the sale of its stock. As officers of National, a licensed dealer, McNatt and Frank were authorized to sell securities in the name of that corporation in Arkansas. During the period from April 1, 1956 to September 4, 1956, National sold to the public for Bankers' stock at $5 per share. During the period September 5, 1956 to December 4, 1956, National sold to the public for Bankers' stock at $6.25 per share. After December 5, 1956, National sold to the public for Bankers' stock at $7.25 per share. National renewed its authority as a broker-dealer in the State of Arkansas on April 2, 1957. During the period from April 4, 1957 to December 31, 1957, National sold stock for Peoples for $3 per share. National reported the commissions earned on the sale of Bankers' stock on its corporate income tax returns for the fiscal years ended March 31, 1957 and March 31, 1958, and the commissions earned on the sale of Peoples' stock on its corporate Federal income tax return for the taxable years ended March 31, 1958. National *233 on its corporate income tax return for its taxable year ended March 31, 1957, showed no amount paid as compensation to officers. It showed advertising expenses of $13,021.53 and total deductions of $46,962.58 with a net income of $8,226.46. On its corporate income tax return for the taxable year ended March 31, 1958, it showed total income of $31,230.95, total deductions of $33,656.14, and a net loss of $2,425.19. It showed no deductions for officers' salaries. Included in the deductions claimed was an amount of $4,771.14 shown as advertising. Bankers paid no dividends from 1950 through 1957 and Peoples paid no dividends during the period October 25, 1956 through December 31, 1957. During the calendar years 1956 and 1957 the joint venture sold stock of Bankers and Peoples in the amounts, on the dates, and for the prices as follows: Calendar Year 1956
Bankers Insurance Co.
No. of
Shares
Date Sold
Amount
Cash Sales
1,250
December 1956
$ 6,250.00
1,196
December 1956
5,980.00
2,335
December 1956
12,235.00
4,781
$24,465.00
Installment Sales
12,950
December 1956
$81,015.00
Initial payments and collections
during the year 1956
5,850.87
Calendar Year 1957
Bankers Insurance Co.
23,462
Jan. 1-Dec. 31, 1957
$163,972.58
Peoples Indemnity Insurance Co.
42,606
Jan. 1-Dec. 31, 1957
128,188.00
*234 Frank during the years 1956 and 1957 sold the following shares of Bankers' stock on the dates indicated: Calendar Year 1956
No. of
Shares
Date Sold
Amount
1,893
August 6
$ 7,572.00
330
August 14
1,320.00
700
August 20
2,800.00
100
August 24
400.00
800
April 17
2,800.00
700
September 4
2,800.00
446
October 19
2,230.00
331
October 18
1,655.00
399
October 27
1,995.00
500
October 28
2,500.00
6,199
$26,072.00
Calendar Year 1957
2,500
February 4
$10,000.00
Frank sold 5,000 shares of Peoples' stock for $7,750, on September 11, 1957. McNatt during the calendar years 1956 and 1957 sold the following shares of Bankers' stock: Calendar Year 1956
No. of
Shares
Date Sold
Amount
800
April 16
$ 3,200.00
925
August 13
3,860.00
1,490
August 21
6,360.00
1,025
October 2
4,525.00
300
October 22
1,500.00
1,011
November 22
5,100.00
200
November 2
1,000.00
399
November 28
1,995.00
6,150
$27,540.00
Calendar Year 1957
2,500
February 4
$10,000.00
All of the stock of Bankers and Peoples sold by the joint venture and by Frank and McNatt individually during 1956 and 1957 was sold *235 by them for National except for some stock reprocessed and sold through brokers other than National. When National salesmen took orders for subscriptions to Bankers' stock subsequent to the date of August 28, 1956, and for subscriptions to Peoples' stock subsequent to May 2, 1957, McNatt as vice president of National made allocations of the orders for the purchase of shares of stock between Bankers and McNatt and Frank, or between Peoples and McNatt and Frank. No allocation of an order for Bankers' stock to the account of Frank or McNatt was made until after 6 months from February 28, 1956, and no allocation of an order for Peoples' stock to the account of Frank or McNatt was made until 6 months after November 2, 1956. [2]
In an exhibit attached to the application of Bankers to the Arkansas State Bank Department on March 29, 1956, requesting a certificate of authority to sell 200,000 shares of no par stock for $1,000,000, Frank and McNatt were listed as stockholders. In an exhibit attached *236 to the application of Peoples to the Arkansas State Bank Department on April 4, 1957, requesting a certificate of authority to sell 100,000 shares of no par stock at $3 per share, Frank and McNatt were listed as stockholders. During January 1958, after dissolution of the joint venture of Frank and McNatt, the unsold stocks of the joint venture consisting of 8,213 shares of Bankers and 23,239 shares of Peoples were distributed to Frank and McNatt. In 1958 Bankers merged into Peoples and the Bankers' stock retained by Frank and McNatt was exchanged for stock in Peoples. On their joint income tax returns for the year 1956, petitioners Willie L. McNatt and Helen McNatt reported short-term capital gain from the sale of 800 shares of Bankers' stock in the amount of $2,200 and long-term capital gains from the sale of Bankers' stock in the amount of $16,613.95 and ordinary income from the joint venture of $2,047.75, and long-term capital gain from the joint venture of $10,872.33. On their joint income tax return for 1957 they reported long-term capital gain from the sale of 2,500 shares of Bankers' stock in the amount of $6,500 and long-term capital gain from the joint venture in the amount *237 of $84,640.86. [3]
Respondent in his notice of deficiency determined that petitioners Willie L. McNatt and Helen McNatt received ordinary income in the year 1956 from the joint venture in the amount of $30,613.42, thus increasing the income as reported by $28,565.67, and ordinary income from the sale of Bankers' stock in that year in the amount of $18,813.95, increasing petitioners' income by this amount and eliminating an amount of $15,103.31 reported as capital gains. Respondent made the following explanation of increases in the income of the joint venture distributable 50 percent to McNatt: (a) It is determined that you received compensation in the form of stock of the Bankers Insurance Company for promotional services as shown below: Fair market value of 20,000 shares
of stock (at $5.00)
$100,000.00
Option price
28,000.00
Additional compensation
$ 72,000.00
(b) and (c) It is determined that the gains realized from the sales of Bankers Insurance Company stock are ordinary income and not capital gains. These *238 stocks were received in the ordinary course of your professional promotional business; and you were a dealer in securities for these stocks. Also the stocks sold do not qualify as capital assets as they were not held for more than six months prior to the sales. The reported capital gain of $21,744.66 is eliminated. The ordinary income from such sales is computed as shown below: Sale of 4781 Shares
No. of
Selling
Shares
Price
Cost
Gain
1250
$ 6,250.00
$ 6,250.00
0
1196
5,980.00
5,980.00
0
2335
12,235.00
11,675.00
$560.00
Total ordinary income from above
sales
$560.00
Installment Gain
12,950 shares
Selling Price
$82,587.00
Cost
64,750.00
Total profit to be
realized
$17,837.00
Percentage of profit
to sales
21,5978%
Initial payments
$ 5,608.64
Total profit for 1956 -
21.5978 percent of
$5,608.64
$ 1,211.34
(d) A deduction is allowed for business expenses of $16,517.50. (e) A deduction is allowed for transfer of tax of $122.50. Respondent made the following explanation with respect to the increase in income determined by him as ordinary income from sale of stock: (b) and *239 (c) It is determined that the gains realized from the sales of Bankers Insurance Company stock are ordinary income and not capital gains. These stocks were received in the ordinary course of your professional promotional business; and you were a dealer in securities for these stocks, also the stocks sold do not qualify as capital assets as they were not held for more than six months prior to the sales. The amount of $15,103.31 is eliminated from capital gains and ordinary income is increased $18,813.95 as shown below: Short-term Capital Gain
Eliminated
Bankers Insurance Company stock
$ 2,200.00
Less: Expense
(282.94)
Net decrease in short-term capital
gain
$ 1,917.06
Long-term Capital Gain
Eliminated
Bankers Insurance Com-
pany stock
$16,613.95
From joint venture
10,872.33
Total
$27,486.28
Less
(1,113.79)
Balance
$26,372.49
Amount eliminated from long-
term capital gain - 50 percent
13,186.25
Decrease in capital gains
$15,103.31
Ordinary Income from Sale of Stock
Bankers Insurance
Company stock:
Selling Price
Cost
Expense
Gain
925 shares
$ 3,860.00
$1,295.00
$ 48.25
$ 2,516.75
1,490 shares
6,360.00
2,086.00
74.50
4,199.50
1,025 shares
4,525.00
1,435.00
51.25
3,038.75
300 shares
1,500.00
420.00
15.00
1,065.00
1,011 shares
5,100.00
1,415.40
50.55
3,634.05
200 shares
1,000.00
240.00
16.55
743.45
399 shares
1,995.00
558.60
19.95
1,416.45
800 shares
3,200.00
1,000.00
2,200.00
6,150 shares
$27,540.00
$8,450.00
$276.05
$18,813.95
*240 For the year 1957 respondent increased the income as reported by petitioners Willie L. McNatt and Helen McNatt in the amount of $137,163.31 of ordinary income from the joint venture and $6,500 ordinary income from the sale of stock. With respect to the joint venture income respondent made the following explanation: (a) It is determined that you received compensation in the form of stock of the Bankers Insurance Company and Peoples Indemnity Insurance Company for promotional services, as shown below: Fair market value of 30,000 shares
of Bankers Insurance Company
stock (at $5.00)
$150,000.00
Option price
42,000.00
$108,000.00
Fair market value of 100,000 shares
of Peoples Indemnity Insurance
Company stock (at $2.00)
$200,000.00
Option price
40,000.00
$160,000.00
Total additional compensation
$268,000.00
(b) and (c) It is determined that the gains realized from the sales of Bankers Insurance Company and Peoples Indemnity Insurance Company stocks are ordinary income and not capital gains. These stocks were received in the ordinary course of your professional promotional business, and you were a dealer in securities for these stocks. *241 Also the stocks sold do not qualify as capital assets as they were not held for more than six months prior to the sales. The reported capital gain on such stocks of $168,361.36 is eliminated. The ordinary income from such sales is computed as shown below: Stock
No. Shares
Selling Price
Cost
Profit
Bankers Insurance Company
23,462
$163,972.58
$117,310.00
$46,662.58
Peoples Indemnity Insurance Company
42,606
128,188.00
85,212.00
42,976.00
Installment gain on Bankers Insurance Company stock, 1957 collections
$32,114.68 at 21.5978 percent
6,936.06
Total ordinary income from above sales
$96,574.64
(d) A deduction is allowed for business expenses of $90,248.02. With respect to the ordinary income from sale of stock respondent made the following explanation: (b) and (c) It is determined that the gains realized from the sales of Bankers Insurance Company stock are ordinary income and not capital gains. These stocks were received in the ordinary course of your professional promotional business, and you were a dealer in securities for these stocks, also the stocks sold do not qualify as capital assets as they were not held for more *242 than six months prior to sales. The amount of $45,340.43 is eliminated from capital gains and ordinary income is increased $6,500.00 as shown below: Long-term Capital Gain Eliminated
Bankers Insurance Company stock
$ 6,500.00
From joint venture
84,180.86
Total
$90,680.86
Amount eliminated from long-term
capital gain - 50 percent
$45,340.43
Ordinary Income from Sale of Stock
Bankers Insurance Company stock
$ 6,500.00
Petitioners Sam Frank and Esther Frank on their joint returns for 1956 reported ordinary income from the joint venture of $2,047.75 and long-term capital gain from the joint venture of $10,872.33. They reported short-term capital gain from the sale of Bankers' stock in the amount of $10,299.80 and long-term capital gain from the sale of Bankers' stock in the amount of $7,853.60. These petitioners on their joint income tax return for 1957 reported long-term capital gain from the joint venture in the amount of $84,640.86 and long-term capital gain from the sale of Bankers' stock in the amount of $6,500 and from the sale of Peoples' stock of $4,595.44. Respondent in his notice of deficiency determined that petitioners Sam Frank, Jr., and *243 Esther Frank had ordinary income for the year 1956 from the joint venture in the amount of $30,613.42, thus increasing the ordinary income by $28,565.67 and that petitioners had ordinary income from the sale of stock of $17,753.40, and that capital gains of $17,273.90 should be eliminated. For the year 1957 respondent determined that petitioners Sam Frank Jr., and Esther Frank had ordinary income from the joint venture of $137,163.31 and from the sale of stock of $11,095.44. The explanations for the adjustments made by respondent in his determination given to Sam Frank, Jr., and Esther Frank were in substance the same as the ones given to petitioners Willie L. and Helen McNatt. Respondent's first contention is that Frank and McNatt received compensation for promotional services in the amount of the fair market value of Bankers' and Peoples' stock on the dates that the stock was delivered or turned over to them in 1956 and 1957. In support of this contention, respondent points out that the contract of February 28, 1956, whereby Bankers agreed to permit Frank and McNatt to purchase 50,000 shares of stock and the contract of November 2, 1956, whereby Peoples agreed to permit them to *244 purchase 100,000 shares of its stock, both refer to such agreement being "in further consideration for the services of" Frank and McNatt. Respondent argues that since the contract, itself, and the notes given by Frank and McNatt, jointly and individually, show that the stock was not to be turned over or delivered to Frank and McNatt until paid for, the date on which the stock was actually turned over or delivered to Frank and McNatt is to be used in determining the amount that was received by them as compensation which respondent measures by the difference in the fair market value of the stock upon the date of its delivery to Frank and McNatt and the amount paid by Frank and McNatt for the stock. In Commissioner v. LoBue, 351 U.S. 243 (1956) the Supreme Court, referring to Commissioner v. Smith, 324 U.S. 177, stated that it is, of course, possible for the recipient of a stock option to realize an immediate taxable gain where the option has a readily ascertainable market value and the recipient might be free to sell his option but that where this situation does not exist, compensation to employees given stock options subject to contingencies is measured *245 by the difference between the option price and the market value of the shares at the time the option is exercised. The case was remanded for a determination of when the option involved therein was exercised. In the instant case even though the contract does not specifically refer to an option being granted to Frank and McNatt, and Frank and McNatt were not employees of Bankers and Peoples, the agreement to permit them to purchase stock in Bankers and Peoples was in the nature of an option granted to them for services rendered or to be rendered and the problem here involved is similar to that involved in the case of an option given to an employee. After remand in the LoBue case, we held in Philip J. LoBue, 28 T.C. 1317 (1957), affd. 256 F. 2d 735 (C.A. 3, 1958), that LoBue exercised his option when he gave notes for the stock which the option gave him the right to purchase, and, thereby became unconditionally required to pay for the stock and unconditionally entitled to receive the shares when they were paid for. In so holding we relied on Estate of James S. Ogsbury, 28 T.C. 93 (1957), affd. 258 F. 2d 294 (C.A. 2, 1958). In *246 Estate of James S. Ogsbury, supra, we held that the economic benefit of an option held by a taxpayer was realized by him upon his exercise of the option and that it was at that time that he was in receipt of the value represented by the stock option. Thereafter, by his own action in making payment, he could at any time take delivery of the stock and utilize all the rights with respect thereto. If Frank and McNatt by giving their notes to Bankers and Peoples, respectively, in effect exercised the options granted to them to purchase Bankers and Peoples stock, then, under our holding in Philip J. LoBue, supra, and Estate of James S. Ogsbury, supra, it is at this time that they realized the economic benefits from the right to purchase granted to them by the contract and took on the obligation to purchase the stock. Respondent, however, contends that the purchase of stock in Arkansas by giving therefor a promissory note is illegal and that, therefore, the principles in Philip J. LoBue, supra, and Estate of James S. Ogsbury, supra, do not apply in the instant case. Respondent cites section 64-209 of the Arkansas Statutes *247 [4] and Lepanto Gin Co. v. Barnes, 182 Ark. 442, 31 S.W. 2d 746 (1930), in support of his position that the notes given by McNatt and Frank for the purchase of the Peoples and Bankers' stock were void and, therefore, did not in fact fix any rights of the parties. *248 Petitioners argue that since section 64-209 of the Arkansas Statutes relates to corporations organized under the Business Corporations Act, section 64-101 of which specifically provides that an insurance company may not be organized under the Act, this section of the Arkansas Statutes is inapplicable to stock of Bankers and Peoples. Petitioners point to the fact that Title 66 of the Arkansas Statutes governs insurance companies and does not contain a provision similar to section 64-209. Petitioners cite no cases in support of their contention but in any event whether the provisions of section 64-209 of the Arkansas Statutes are applicable to the stock of Bankers and Peoples is not controlling of the issue here involved. Article 12, section 8 of the Arkansas Constitution[5] provides that no private corporation shall issue stocks or bonds except for money or property actually received or labor done. Under the holding of the Arkansas Courts, a note is not property within the meaning of this section of the Arkansas Constitution but is merely evidence of indebtedness whereby the transaction shows upon its face that the stock has not been paid for. Taylor v. Gordon, 180 Ark. 753 (1959), 22 S.W. 2d 561, *249 and Lepanto Gin Co. v. Barnes, supra. This provision of the constitution is applicable to stock issued by an insurance company. Fox v. Republic Nat. Life Ins. Co., 203 Ark. 827, 159 S.W. 2d 67 (1942). In the instant case the stock involved was in one instance a new issue of stock and in the other, the original issue of stock of the corporations involved. We have set out in some detail in our findings the contracts and notes here involved. The *250 facts as set forth in our view constitute an option from Bankers and Peoples to Frank and McNatt to subscribe to, in the case of Bankers a new issue of stock, and in the case of Peoples an original issue, and the notes of Frank and McNatt constitute an agreement to subscribe to this stock. Interpreted in this light, the contracts and notes are not, upon the date of their execution, a consummated or completed sale of the stock in violation of the constitutional provision of Arkansas, but merely constitute a contract of sale and purchase of the stock with the title and ownership of the stock to become vested upon payment of the notes. Cf. Don Johnston Drilling Co. v. Howard, 347 P. 2d 640 (Okla.Sup. Ct., 1959) and annotations thereto "Construction and effect of constitutional or statutory provisions precluding issuance of corporate stock in consideration of promissory notes", 78 Ann. A.L.R. 2d 834, 839. A note given as evidence of the balance due on a subscription agreement to stock is not void under Arkansas law as being in violation of article 12, section 8 of the Constitution of that State. In Thomas v. Arkansas State Fair Ass'n, 181 Ark. 748, 27 S.W. 2d 515 (1930) *251 the Arkansas Supreme Court held that the provision of the Arkansas constitution prohibiting a sale of stock for other than money, property, or labor and the cases holding void a note given to a corporation in payment for its capital stock have no application to a note given as evidence of a balance due on a subscription agreement since under such agreement the stock is not to be issued or delivered except upon full payment of the amount subscribed and the subscriber has not purchased stock nor the corporation sold him stock. Such notes are valid, just as are the subscription agreements valid and enforceable contracts. Cf. 78 Ann. A.L.R. 2d, section 3[a] Sales versus subscription, pages 839-844. On the facts here present we hold that the contract between Bankers andFrank and McNatt was in effect an option given by Bankers to Frank and McNatt to subscribe to new stock being issued by Bankers, and that the notes given by Frank and McNatt constituted the exercise of this option and their agreement to subscribe to the new issue of stock at the option price, and that the contract between Peoples and Frank and McNatt was in effect the granting of an option on the part of Peoples to *252 Frank and McNatt to subscribe to an original issue of stock of that company and the notes executed by Frank and McNatt constituted an exercise of the option and an agreement by Frank and McNatt to subscribe to the number of shares of stock as set forth in the note. Since these contracts were in each instance entered into prior to the time the corporation involved had received permission to issue the stock, the agreement to permit Frank and McNatt to purchase stock had no readily ascertainable market value at that time. Cf. Union Chemical & Materials Corp. v. United States, 296 F. 2d 221 (Ct. Cl. 1961). Therefore, the value of the further consideration for the services of Frank and McNatt provided for in the contracts is to be determined at the date of the exercise of the option granted in these contracts which was the date of the delivery to the corporation of the notes to them given by Frank and McNatt. The evidence sustains petitioners' contention that the fair market value of the stock at that time was not in excess of the price which the contracts required Frank and McNatt to pay therefor. In each instance the notes were given prior to the time the corporations were *253 granted authority to sell stock at any price other than the price at which Frank and McNatt were permitted to purchase the stock and while the only sales being made of the stock were to the corporations' officers, promoters, and agents which sales were at the same price or a lesser price than that which Frank and McNatt agreed to pay. We therefore hold that neither Frank nor McNatt received income as compensation under the agreements to permit them to purchase Bankers' and Peoples' stock. Respondent's second contention with respect to the stock sold by the joint venture is that this stock had not been held for 6 months prior to the sale thereof and, therefore, the gains realized were short-term capital gains in their entirety and not to any extent long-term capital gains as reported. Respondent also makes this contention with respect to the stock sold individually by Frank and McNatt. A different situation is presented with respect to the holding period of the stock from that presented with respect to the time of valuing the agreement of Bankers and Peoples to permit Frank and McNatt to purchase stock. In determining when petitioners' holding period began for the purpose of determining *254 whether the gain realized was short-term or long-term capital gain within the provisions of section 1222 of the Internal Revenue Code of 1954[6] we must look to the date when Frank and McNatt acquired the stock. The date of acquisition of the stock is governed by the applicable State law. George W. S. Swenson, 37 T.C. 124 (Oct. 31, 1961), on appeal (C.A. 8, Jan. 19, 1962).
Petitioners contend that Frank and McNatt acquired ownership of the stock in Bankers and Peoples when they gave their notes for the purchase of that stock, *255 and in support of their contention point out that they were permitted to vote the stock, that they were listed as stockholders on applications made by Bankers and Peoples to the Arkansas State Bank Department, and that the restrictions contained in the contract with respect to payment of dividends on the stock were meaningless since the corporation paid no dividends during any of the years here involved. If petitioners had sold their right to subscribe to the stock of Bankers and Peoples, there might be validity to their contention that upon giving their notes to the respective corporations they had by acceptance of the contractual offer acquired the right to subscribe and that the holding period of such right began upon the date the notes were given. However, what petitioners sold was the stock. The constitution of the State of Arkansas which forms a part of the contract between the parties Hospelhorn v. Burke, 196 Ark. 1028, 120 S.W. 2d 705 (1938) prohibited Bankers or Peoples from issuing stock except for money or property and under this constitutional provision a promissory note is not considered property. Therefore, no stock was acquired by Frank and McNatt until *256 paid for in full which insofar as the record here shows occurred with respect to stock as it was turned over to them and on the dates such stock was turned over to them. [7]George W. S. Swenson, supra.
As shown in our findings the certificates made out in the names of Frank and McNatt at the time the promissory notes were given by them to Bankers and Peoples were not delivered to them but were attached to their notes as security. The note to Peoples was worded in accordance with the provisions of section 64-209 of the Arkansas Statutes. This statute provided for the making out of the certificate and retention thereof by the corporation with a notation on its face that the certificate was being held as collateral for the note. Whether or not this statute was applicable to the transactions here involved since the stock was that of insurance *257 companies, the system followed was not such as to constitute more than an allotment of the shares by the corporations to Frank and McNatt to be sold to them upon payment of money therefor. Cf. Thomas v. Arkansas State Fair, supra, and Snodgrass v. E. A. Zander & Co., 106 Ark. 462, 154 S.W. 212 (1913). The cases relied on by petitioners where the date of acquisition of corporate stocks or bonds has been held to be a date other than the date upon which they were issued all involved factual situations and applicable state law so different from that here involved that no detailed discussion thereof is considered necessary. The record shows that on July 26, 1956, Bankers turned over to Frank and McNatt, each, 5,000 shares of its stock for which a certificate had been made out on March 28, 1956 in the joint names of McNatt and Frank and held by Bankers as security for the note in the amount of $14,000 given to it on March 22, 1956, by Frank and McNatt jointly. The record also shows that this note was paid in full on July 26, 1956. An additional 10,000 shares of stock was turned over to each Frank and McNatt by Bankers on December 17, 1956, at which time notes *258 previously given were retired and new stock subscription notes executed by each of them subscribing for 15,000 shares. It is therefore clear that none of the Bankers' stock sold by Frank or McNatt individually or by the joint venture in 1956 had been held for more than 6 months prior to the date of sale and that the gain on the sale of this stock constituted short-term capital gain. For the year 1957 Frank and McNatt each reported on their individual returns sales of 2,500 shares of Bankers' stock on February 4, 1957. The record does not precisely show whether this stock came from the 5,000 shares each turned over to Frank and McNatt on July 26, 1956, and thus had been held for over 6 months or whether it came from the 10,000 shares of stock turned over to each of them on December 17, 1956. However, since the record does show total sales of Bankers' stock in 1956 by Frank and McNatt and the joint venture including an installment sale by the joint venture, in excess of the 30,000 shares turned over and delivered to them in that year and shows individual sales by Frank and McNatt, each, in 1956 of Bankers' stock in excess of 5,000 shares, it is reasonable to conclude that none of the *259 2,500 shares each sold by Frank and McNatt individually on February 4, 1957, came from the 5,000 shares of stock each turned over to them on July 26, 1956. The precise dates of the sale of the 25,462 shares sold by the joint venture in 1957 are not shown. A note to the date sold column with respect to this stock in the return of income of the joint venture stated that all sales were made from January 1 to December 31, 1957. Since this stock apparently came from the 30,000 shares representing 15,000 shares turned over to Frank and McNatt each on February 14, 1957, there is nothing in the record to show that this stock had been held more than 6 months when it was sold. Although the record is not unmistakably clear, the inference is that Frank and McNatt each turned over some of the Bankers' stock issued to them from the 50,000 shares provided for in the February 28, 1956, contract to the joint venture. If this assumption is correct, the joint venture would have had available on December 17, 1956, not more than 20,000 shares [8] of which 17,731 were sold before the end of the year 1956. In this state of the record, there is nothing to indicate that any of the shares of Bankers' stock *260 sold by either the joint venture or Frank and McNatt, individually, had been held for more than 6 months when it was sold in 1957. Since none of the Peoples' stock was actually turned over or delivered to Frank and McNatt prior to July 29, 1957, it is clear that the stock of that corporation sold by the joint venture as well as by Frank, individually, in the year 1957 had not been held for more than 6 months. We therefore sustain respondent in his contention that the gains realized by the joint venture and by Frank and McNatt in the years 1956 and 1957 from the sale of the Bankers' and Peoples' stock constituted short-term capital gain and not long-term capital gain as portions of these sales were reported. Since respondent's contention that the stock *261 sold by Frank and McNatt was held by them primarily for sale to customers in the ordinary course of their trade or business was an alternative contention to his contention that the stock had not been held by Frank and McNatt or the joint venture for a period of over 6 months prior to its sale, we need not pass on this contention. Decision will be entered under Rule 50. Footnotes
1. The record contains a note dated December 17, 1956, given by McNatt in subscription for 20,000 shares of Bankers' stock. From the stipulated facts this appears to be an additional subscription, but the record in this respect is not clear.↩
2. This date is shown in the stipulation of facts filed in this proceeding as November 2, 1957. This is clearly a typographical error since the contract referred to was dated November 2, 1956.↩
3. There is no explanation for the difference in this amount and the $84,180.86 stated in the deficiency notice as income from the joint venture.↩
4. Ark. Stat. Ann. (1957), Sec. 64-209. Deferred payments under subscription contract. - Shares of stock in any corporation may be allotted to subscribers and paid for in one or more deferred installments. A certificate evidencing the allotment of such shares may be issued to the subscriber in advance of the actual payment of the deferred installment or installments. However, every certificate thus issued shall recite upon its face that the subscription price therefor remains wholly or partly unpaid; and a holder of such certificate will be deemed the actual owner of the shares therein mentioned merely to such extent as actual payment has been made to the corporation under the subscription contract covering such shares. In other words, each payment under the subscription contract will vest in the subscriber an actual ownership pro tanto in the shares covered by the subscription contract. To the extent of such actual ownership, the subscriber may be entitled to participate in dividends and/or to vote if such privilege or privileges shall be expressly extended under the articles of incorporation (or any amendment thereto) to stock of that character; provided, in no event shall a stockholder vote a fractional share unless express authority therefor appears in the articles of incorporation, or an amendment thereto. * * *↩
5. Arkansas Constitution, art. 12, sec. 8↩. Private corporations - Issuance of stocks or bonds - Conditions and restrictions. - No private corporation shall issue stocks or bonds, except for money or property actually received or labor done, and all fictitious increase of stock or indebtedness shall be void; nor shall the stock or bonded indebtedness of any private corporation be increased, except in pursuance of general laws, nor until the consent of the persons holding the larger amount in value of stock shall be obtained at a meeting held after notice given for a period not less than sixty days, in pursuance of law.
6. Sec. 1222(1), I.R.C. 1954. Short-term capital gain. - The term "short-term capital gain" means gain from the sale or exchange of a capital asset held for not more than 6 months, if and to the extent such gain is taken into account in computing gross income. * * *
(3) Long term capital gain. - The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income.↩
7. It appears that payments on the notes were considered by the parties as partial payment on the agreed price of all shares subscribed for until the corporations and Frank and McNatt agreed that it should represent payment in full for specified shares which appear to be the dates such shares were turned over to Frank and McNatt.↩
8. The total shares of Bankers' stock sold by Frank and McNatt, individually, and by the joint venture in 1956 is 30,080. The record does not show the circumstances of acquisition of any such stock in excess of 30,000 shares consisting of 6,199 shares sold individually by Frank, 6,150 shares sold individually by McNatt, 4,781 shares of cash sales by the joint venture, and 12,950 shares of installment sales by the joint venture.↩